IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

PEDRO RAMOS, A27-684-493,            **REPORT AND RECOMMENDATION**

                Petitioner,

v.                                               07-CV-00858(A)(M)

MICHAEL CHERTOFF, et al.,

                Respondents.

---

Petitioner filed a petition under 28 U.S.C. §2241 *et. seq.*, seeking a writ of habeas corpus ordering his release from the custody of the Department of Homeland Security, United States Immigration and Customs Enforcement ("DHS") on December 28, 2007 (Dkt. #1). On June 27, 2008, Hon. Richard J. Arcara referred the case to me pursuant to 28 U.S.C. §636(b) for all proceedings necessary to determine the factual and legal issues presented, and for preparation of a Report and Recommendation (Dkt. #10). Oral argument was conducted before me on July 29, 2008, and a further status conference was conducted on August 28, 2008. For the following reasons, I recommend that the petition be DENIED.

## BACKGROUND

Petitioner is a native and citizen of the Dominican Republic (Dkt. #7-2, Declaration of George Scott, ¶5). He entered the United States in 1983 without inspection and was convicted on or about December 1, 1986 of criminal sale of a controlled substance in the third degree, criminal possession of a controlled substance in the second degree, and criminal possession of a weapon in the third degree (Id. at ¶¶5, 6). On February 12, 1990 petitioner was

removed from the United States to the Dominican Republic (Id. at ¶9). At some point, petitioner re-entered the United States[1] and after being convicted of a parole violation, the prior order of deportation was reinstated (Id. at ¶¶11 and 12).

On or about June 1, 2007, petitioner was received into the custody of DHS and has been detained since that time pursuant to the reinstated Warrant of Deportation (Id. at ¶¶13 and 14; Dkt. #7-3, Declaration of George Scott, Ex. A, p. 1). Petitioner's deportation has been delayed because, to date, the Dominican Republic has not issued the necessary travel documents (Dkt. #1, Petition, ¶17).[2]

Petitioner argues that there is no significant likelihood of his removal in the foreseeable future and that his detention is therefore improper under Zadvydas v. Davis, 533 U.S. 678, 701 (2001). He also argues that his continued detention is unlawful because respondents have violated various regulatory requirements during his detention (Dkt. #1, Petition).

Respondents counter that petitioner's continued detention is permissible because he "has failed to provide information and documentation to assist with securing a travel document for his removal which has impeded the efforts to obtain a travel document . . . [and] has used a number of aliases, provided DHS with misleading information, and reentered the United States using fraudulent documents" (Dkt. #8, Respondents' Memorandum of Law, pp. 12-

---

[1] The petition alleges that petitioner re-entered the United States without inspection in approximately 1992 and that he has not departed the United States since that time (Dkt. #1, ¶¶8, 9), whereas respondents allege that on November 12, 2006 petitioner re-entered the United States in San Juan, Puerto Rico using fraudulent documents under the name of Jose Lopez-Santiago (Dkt. #7-2, Declaration of George Scott, ¶10). Respondents also allege that during subsequent questioning by law enforcement officers, petitioner stated that his name was Santo Gil Hernandez (Id.).

[2] Although petitioner was previously deported to the Dominican Republic, there is no copy of his previous travel documents in DHS's file (Dkt. #7-3, Declaration of George Scott, Ex. A, p. 23).

13). Alternatively, respondents argue that there is a reasonable expectation that petitioner will be released from custody in the foreseeable future once his identity has been confirmed by the Dominican Republic (Id. at p. 3).

### DISCUSSION AND ANALYSIS

Once an order of removal against an alien becomes final, the Attorney General is generally required to remove the alien from the United States within 90 days. See 8 U.S.C. §1231(a)(1)(A). However, "the removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal." 8 U.S.C. §1231(a)(1)(C). "In considering whether aliens have satisfied their obligations under §1231(a)(1)(C), courts look to whether they have undertaken overt actions to thwart removal, whether they can or have produced affidavits from friends and family to support their claims of nationality, whether they have requested travel documents from the country of intended removal, whether they have attempted to contact the country of intended removal's consulate, and/or whether they can or have provided the INS with requested documents." Hydara v. Gonzales, 2007 WL 2409664, *2-3 (D. Minn. 2007).

If the removal period has not been extended, 8 U.S.C. §1231(a)(6) governs post-removal detentions. See Liu v. Chertoff, 2006 WL 4511941, *3 (W.D. Tex. 2006). Section 1231(a)(6) "provides that certain classes of aliens . . . shall continue to be subject to 'supervision' even after the 90 day period expires if they have not yet been removed." Kassama

v. Department of Homeland Security, 553 F. Supp. 2d 301, 305 (W.D.N.Y. 2008) (Siragusa, J.). Although Section 1231(a)(6) does not set a limit on the length of detention beyond the removal period, the Supreme Court in Zadvydas, supra, has held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." 533 U.S. at 699. Under Zadvydas, the first six months of detention beyond the removal period are presumptively permissible. Id. at 701. Once the six-month period has passed, the burden is on the alien to "provide[ ] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future . . . ." Id. Only then does the burden shift to the government, which "must respond with evidence sufficient to rebut that showing." Id.[3]

"On one hand, to meet his burden the alien is not required 'to show the absence of any prospect of removal - no matter how unlikely or unforeseeable.' On the other hand, the alien does not prevail merely be [sic] demonstrating the absence of a repatriation agreement between the U.S. and his home country." Kassama, supra, 553 F. Supp. 2d at 305.

The record demonstrates that DHS has undertaken various efforts to confirm petitioner's identity in an effort to have the Consulate General of the Dominican Republic issue the necessary travel documents:

---

[3] If the six-months has passed and removal is not reasonably foreseeable, "the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances." Zadvydas, supra, 533 U.S. at 700 (citing 8 U.S.C. §§1231(a)(3), 1253; 8 C.F.R. §241.5).

- June 12, 2007 - DHS sent a presentation packet to the Consulate requesting that travel documents be issued for petitioner. DHS was advised that no travel document would be issued without petitioner presenting some form of identification (Dkt. #7-2, Declaration of George Scott, ¶15).

- October 18, 2007 - Fingerprints were provided by petitioner, which matched the fingerprint card for the individual that was deported in 1990 (Dkt. #7-3, Declaration of George Scott, Ex. A, at pp. 8, 55).

- October 26, 2007 - DHS sent a new presentation packet to the Consulate (Dkt. #7-2, Declaration of George Scott, ¶16).

- November 6, 2007 - petitioner provided various pedigree information to DHS and indicated that he had lost his birth certificate and other forms of identification (Dkt. #7-3, Declaration of George Scott, Ex. A, pp. 13-16).

- December 4, 2007 - DHS sent a presentation packet to the Dominican Republic Embassy ("Embassy")(Dkt. #7-2, Declaration of George Scott, ¶24).

- January 28, 2008 through April 21, 2008 - DHS telephoned the Embassy on several occasions regarding the status of petitioner's travel documents (Dkt. #13, Supplemental Declaration of George Scott, ¶24).

- June 2, 2008 - DHS contacted a Dominican Investigator to obtain identification information about petitioner (Id. at ¶27).

- June 10, 2008 - DHS interviewed petitioner and he provided conflicting statements regarding his family (Id. at ¶28).

- July 2, 2008 - DHS sent birth certificates for both of petitioner's parents to the Consulate (Id. at ¶30).

- August 22, 2008 - DHS sent photographs of petitioner's brothers along with other family information to the Consulate (Dkt. #16, Supplemental Declaration of George Scott, ¶12).

In addition to DHS's efforts to obtain petitioner's travel documents, on July 18, 2007 petitioner's common law wife, Camille Vega, sent the Consulate a letter advising him that she was in the "process of locating relatives in the Dominican Republic in [her] attempt to

obtain more documentation" (Dkt. #9-3, Petitioner's Evidence in Support of Reply to Respondent's Answer, p. 58). On September 3, 2007 Ms. Vega again advised the Consulate that she had been trying to provide the necessary documentation (Id. at p. 57). However, Ms. Vega now states:

> "I no longer contact the consulate because what they have asked me to retrieve is impossible for me. I have exhausted all my efforts in helping my husband obtain his travel documentation, not because we are uncooperative, but simply because we just don't have anything else at our reach at this time" (Dkt. #2, Exs. 4-5).

Furthermore, on November 24, 2007, and May 10 and 15, 2008, petitioner's counsel sent letters to the Consulate requesting him to advise how petitioner could obtain a birth certificate (Dkt. #9-3, Petitioner's Evidence in support of Reply to Respondent's Answer, pp. 60, 65, 73).

Despite petitioner's prior deportation to the Dominican Republic in 1990, the Consulate has undertaken its own efforts at confirming petitioner's identity. However, the Consulate has previously indicated that travel documents would be issued:

- November 5, 2007 - the Consulate advised that more time was needed before travel documents could be issued (Dkt. #7-2, Declaration of George Scott, ¶16).

- December 7, 2007 - The Embassy interviewed petitioner (Id. at ¶24).

- May 22, 2008 - the Consulate's representative, Delia Fox, advised DHS that petitioner had not provided any assistance in obtaining travel documents (Id. at ¶26).

- June 16, 2008 - a representative from the Consulate advised DHS that the Consulate was continuing attempts to verify petitioner's true identity (Dkt. #16, Declaration of George Scott, ¶11(a)).

- July 10, 2008 - the Consulate interviewed petitioner and following the interview advised that a travel document would be issued for petitioner (Id. at ¶11(c)).

- July 21, 2008- the Consulate's representative, Ms. Fox, advised DHS that a new Consulate had been appointed and that she would await the new Consulate's start on August 16, 2008 to issue the travel document for Petitioner (Id. at ¶11(d)).

Because of petitioner's alleged failure to assist in obtaining travel documents, DHS has served petitioner with numerous I-229(a) "Warning For Failure to Depart" forms, which advised him that the statutory removal period could be extended if he refused "to make an application in good faith, for a travel or other document necessary for [his] removal" (Dkt. #7-3, Declaration of George Scott, Ex. A, pp. 40-41, 27-39; Dkt. #16-2, Supplemental Declaration of George Scott, Ex. C, p. 2). DHS also served petitioner with a "Notice of Failure to Comply" on November 20, 2007, advising him that he would remain in DHS custody until he could demonstrate that he was making reasonable efforts to comply with the order of removal (Dkt. #7-3, Declaration of George Scott, Ex. A, p. 25).

In an effort to conclusively determine the certainty and imminence of petitioner's removal, on August 28, 2008 I requested DHS "to inquire with the Consulate General of the Dominican Republic as to when petitioner's travel documents will be issued" and to advise me of the Consulate's response (Dkt. #18). On September 3, 2008 DHS made this inquiry (Dkt. #19-2, Supplemental Declaration of George Scott, Ex. D). Additionally, DHS advised the Consulate that it had recently learned that petitioner's "parents are Martin GIL-HIDALGO and Antonio HERNANDEZ" and that his brother, Julian Gil, gave a sworn statement that petitioner's "true and correct name is Santo Gil-Hernandez" and that he "has used the alias Pedro Ramos on numerous occasions" (Id.).

The Consulate's representative, Ms. Fox, has advised that she will present this new information and the request to the Consulate (Dkt. #19, Supplemental Declaration of George Scott, ¶6). However, to date, no reply has been received from the Consulate as to when or if travel documents will be issued for petitioner (Id. at ¶8).

Notably, Santo Gil-Hernandez is also the identity petitioner gave when he was re-arrested in 2006 (Dkt. #7-2, Declaration of George Scott, ¶10). However, as petitioner highlights, it is curious that Mr. Gil's sworn statement has not been submitted by DHS (Dkt. #20, Petitioner's Reply, p. 3). Mr. Gil's assertion also directly conflicts with not only the petitioner's own telephonic affidavit (Dkt. #20-2, ¶8), but also the fact that petitioner's fingerprints were a match to the individual previously deported to the Dominican Republic in 1990 as Pedro Ramos (Dkt. #7-2, Declaration of George Scott, ¶20).

Nevertheless, I need not determine whether petitioner has been forthright about his identity, because I reach the same conclusion whether petitioner is Pedro Ramos, Santo Gil-Hernandez or someone else. To the extent that petitioner has been withholding his true identity and providing false information, I find that he has acted to prevent his removal within the meaning of 8 U.S.C. §1231(a)(1)(C) and that his continued detention under that provision is lawful. See Powell v. Ashcroft, 194 F. Supp. 2d 209, 210 (E.D.N.Y. 2002)("Petitioner's conflicting statements and the difficulties they have caused respondents in effectuating his removal belie his claim that he has cooperated with the efforts of the INS to remove him").

Likewise, if petitioner has been truthful about his identity, I find that he has failed to meet his initial burden under Zadvydas, supra. "The evidence does not establish that there is no significant likelihood of removal in the reasonably foreseeable future. Instead, [the

Dominican Republic] is presently attempting to verify petitioner's citizenship" because he is unable to produce a birth certificate. Kassama, supra, 553 F. Supp.2d at 307 (denying petition for a writ of habeas corpus where "1) Petitioner has been in custody awaiting deportation for approximately 21 months; 2) during that time ICE has contacted the Gambian Embassy numerous times to request the issuance of travel documents for Petitioner; and 3) the Gambian Embassy has indicated that it is investigating the request."). In that regard, petitioner was previously deported to the Dominican Republic in 1990 and there is nothing to indicate that this will not occur again. At least some of the delay in the issuance of travel documents has been attributable to the change in consulates. However, DHS has repeatedly contacted the Consulate and the Consulate has given no indication that travel documents will not be issued.

" 'For detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the reasonably foreseeable future conversely would have to shrink.' " Kassama, supra, 553 F. Supp. 2d at 307 n. 4. However, " 'that period is shrinking here.' " Id. Therefore, if it subsequently appears that petitioner's removal is not reasonably foreseeable because of his continued detention or for any other reason, he may file another petition. See id.

Petitioner also alleges that DHS has failed to conduct a custody review as required by 8 C.F.R. §241.4 and 241.13(e), thereby making his continued detention unlawful and in violation of his due process rights (Dkt. #1, Petition, Count III). In response, respondents argue that because of petitioner's lack of cooperation, the statutory removal period has not expired (Dkt. #8, Respondent F, Memorandum of Law, p. 14). The regulations require that "the district director . . . will conduct a records review prior to the expiration of the removal period." 8

C.F.R. §241.4(h)(1). However, while the removal period is 90 days, "it is extended . . . if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure . . . . The Service will provide such an alien with a Notice of Failure to Comply . . . before the expiration of the removal period." 8 C.F.R. §241.4(g)(1)(ii). In accordance with this regulation, on November 20, 2007, DHS provided petitioner with a Notice of Failure to Comply Pursuant to 8 C.F.R. 241.4(g), indicating, *inter alia*, that his "custody status has been reviewed" and the removal period was been extended because of petitioner's failure to produce identity documents (Dkt. #7-3, Declaration of George Scott, Ex. A, p. 25). The notice further provided that the decision was "based on a review of [petitioner's] file and/or . . . personal interview and consideration of any information [he] submitted to ICE's reviewing officials" (Id.). Although this notice was provided beyond the 90-day removal period, such failure "shall not have the effect of excusing the alien's conduct." 8 C.F.R. §241.4(g)(5)(iv). Therefore, I find that the DHS has not failed to comply with its regulatory requirements.

Petitioner's reliance on 8 C.F.R. §241.13 is similarly misplaced. "Section 241.13 is triggered once the alien has shown good reason to believe there is no significant likelihood of removal." Liu, supra, 2006 WL 4511941 at *4. However, " 'This section does not apply to: . . . (ii) Aliens subject to final order of removal who are still within the removal period, including aliens whose removal period has been extended for failure to comply with the requirements of . . . the Act.' " Id. (quoting 8 C.F.R. §241.13(b)(3)(ii)).

## CONCLUSION

For these reasons, I recommend that the petition be DENIED and this action be dismissed, without prejudice to petitioner's right to file another petition if it subsequently appears that petitioner's removal is no longer reasonably foreseeable. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of

Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED:   October 14, 2008

 

_/s/ Jeremiah J. McCarthy_
JEREMIAH J. MCCARTHY
United States Magistrate Judge